THE CITY OF EAST ORANGE, complainant,

*v.*

THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY and THE MORRIS AND ESSEX RAILROAD COMPANY, defendants.

[Decided May 12th, 1923.]

Where a city and a railroad entered into a contract stipulating that the railroad tracks will be raised so as to rest upon an elevated roadbed supported by retaining walls where necessary, their passenger stations and other facilities relocated, altered or reconstructed, and the streets intersected by the railroad changed, vacated or relocated, all as shown on certain identified plans, and the railroad now proposes to construct on the lower platform of the station eighteen glass front stores, not shown on the identified plans, such action will be enjoined, especially when the city has spent large sums of money in relocating, curbing and paving streets in accommodation of the railroads' scheme of elevation of its tracks.

*Mr. Walter C. Ellis,* for the complainant.

*Messrs. Congleton, Stallman & Hoover (Mr. Stallman),* for the defendants.

BACKES, V. C.

When the public utilities commission ordered the Delaware, Lackawanna and Western Railroad Company and its lessor, the Morris and Essex Railroad Company, to elevate their tracks through the city of East Orange, the railroads and the city entered into a contract whereby it was agreed that

"The railroad companies' tracks will be raised so as to rest upon an elevated roadbed supported by retaining walls where necessary, their passenger stations and other facilities relocated, altered or reconstructed, and the streets intersected by the railroad changed, vacated or relocated, all as shown on the following plans which are hereto annexed and made a part hereof and identified by the signatures of G. J. Ray, chief engineer of the railroad companies, and Charles H. Martens, mayor of the city."

New stations were to be built on the sites of the old Brick Church and the East Orange stations. Plan No. 7 shows the layout of the Brick Church station, with which this litigation is chiefly concerned. The railroads agreed to erect the station in substantial conformity to this plan, and they have since done so. The plan of the elevated structure shows a station facing two streets paralleling the railroad, McKinley avenue to the south and Railroad place on the north, midway between Halstead street on the east and Harrison street on the west, with platforms on the track and street levels extending from the station east and west to Halstead street and Harrison street, a stretch of over five hundred feet in either direction. Stairs at these streets provide access to the upper platform in addition to those in the station proper. The plan of the lower or street level calls for concrete pillars, twenty feet apart longitudinally, and four in a row, to support the elevation and a concrete platform with sixteen parking bays, eight opening on McKinley avenue and eight on Railroad place, east of the station, each bay capable of accommodating two automobiles. The new East Orange station is of similar design. The railroads now purpose to construct on the lower platform of the Brick Church station eighteen glass-front stores, one between each row of columns and to eliminate the parking bays, made necessary by the proposed stores, and threaten to put some in the East Orange station. The city protests and complains against this violation of the terms of the contract and prays an injunction. I think it is entitled to relief. In the contract with the railroads the city on its part undertook to relocate streets, open new ones, curb and pave them, change grades, relocate sewer, water and gas mains, and do many other things, all in accommodation of the railroads' scheme, and it did so at an expense of over half a million dollars. Its compensation for this great outlay was, in the main, the imposing and attractive stations of open column construction and commodious platforms. Its recompense was not, of course, artistic and beautiful stations simply to be appraised and admired as a railroad project, but municipal benefits and advantages

that naturally flow to a community from such structural adornments. Growth in population, enhancement in the value of property, increased ratables, and not the least, civic pride, were some of the elements that induced the city to co-operate so generously with the railroads to bring to it the character of stations it bargained for.

More than that, the railroad runs, practically, through the centre of the city, and I am told by counsel that in the negotiations between the city and the railroads the city steadfastly held out for the open column construction, and for the reason, as he puts it, "the authorities did not want the city to be divided by a 'Chinese wall'." The prospect afforded by the open column construction was its keen concern and the bone of contention with the railroads.

The railroads seem to take the stand that the stations were designed and selected solely with an eye to railroad operation, and that so long as the railroads furnish adequate facilities to their patrons the city and the taxpayers, who helped pay for the improvement, have no concern and will suffer no prejudice by the intended diversion, and therefore are without just cause for complaint. This narrow and selfish view commends itself no more than does the argument that, as the stations are built on the private right of way of the railroads and constitute private property, they cannot be deprived of the use of them in their own chosen way (in this instance by the erection of stores to let for commercial purposes) unless it be found as a matter of law that the manner of the lower level construction amounts to a dedication to public use. Both are beside the question. Stores for non-railroad purposes were never within the contemplation of the contracting parties and they would be an unwarrantable intrusion upon the privileges of the city, assured to it by the contract. The contract, which the railroads covenanted not to deviate from without the consent of the city, is controlling and compelling and it does not lie in the mouth of the railroads to say that the city will not be grievously injured or that it will suffer no great wrong by their failure or refusal to comply substantially with its terms. The city paid the

41

price for the particular type of station and the railroads must live up to their contract.

What has been said applies also to the parking bays. Their elimination is not justified because, as is contended, there is an abundance of parking space in the streets, immediately adjoining the platform, nor because, as is claimed, longitudinal parking alongside the platform is more practical and convenient. The city is not called upon to debate these reasons for evading the contract, even though they have merit. It is entitled to a performance of the contract in accordance with its terms, and an injunction will be advised.

If the railroads attempt to carry out their threat to build stores between the columns at the East Orange station the injunction may be extended to that situation.